## SMITH v. WAGGONER.
### No. 14726.

Court of Civil Appeals of Texas. Fort Worth.

Jan. 4, 1946.

Rehearing Denied Feb. 1, 1946.

Donald & Donald, of Bowie, and M. W. Burch, of Decatur, for appellant.

H. M. Muse, of Wichita Falls, and C. T. Gettys and J. V. Patterson, both of Decatur, for appellee.

BROWN, Justice.

This suit involves the title to a tract of 76.5 acres carved out of the S. E. corner of the Henry Buckner Survey, situated in Wise County, Texas.

On June 7, 1912, William Renshaw, Jr., obtained title to this tract of land by warranty deed from one A. S. Harris, the then record title owner and holder. The tract is described correctly by metes and bounds. The beginning point being the southeast corner of the said Buckner Survey and the first call running west along the south line of the survey; the next call north; the next call east to a point in the east line of such survey; and the last call south to the place of beginning and to a point on the north line of the Samuel Worthington Survey.

On October 31, 1921, the then owner, Renshaw, executed a Deed of Trust conveying the land to a Trustee for City National Bank of Decatur, Texas, to secure a certain indebtedness. This Deed of Trust was renewed on January 7, 1927. The tract of land is correctly described in both Deeds of Trust.

In September, 1928, the banking institution that held Renshaw's notes and the Deed of Trust lien securing them, brought suit against Renshaw seeking a judgment for debt and foreclosure of its said lien, and the record of such suit discloses that the tract of land is correctly described by metes and bounds in the pleadings.

While this suit was pending, Renshaw and wife executed a warranty deed conveying the said land to said banking institution, the deed reciting the cancellation and surrender of the notes held by the bank and sued upon, as aforesaid, and this instrument further recites that: "as further part of the consideration herein (the said bank) agrees to dismiss and pay all court costs in a certain suit of foreclosure on the here-in described lands and premises, now pending in the District Court of Wise County, Texas"; and the tract of land is incorrectly described as "Beginning at the S. W. corner of Henry Buckner Survey; Thence North 523 vrs.; Thence West 838 vrs.; Thence South 525 vrs.; Thence East 838 vrs. to place of beginning, containing 76.5 acres of land."

The error in the description is found in the employment of "southwest" as the designated beginning corner instead of "southeast." Because of the insolvency of the said grantee bank, through a Federal Court receivership, the assets of said bank were conveyed to First National Bank of Decatur, including the tract of land in controversy here, which was given the same erroneous description, but which was also described as the land that Will Renshaw and wife conveyed to said City National Bank, citing the recorded instrument.

The First National Bank of Decatur, on July 25, 1932, conveyed to First National Bank in Decatur many tracts of land including the 76.5 acre tract in controversy which was described as: "Situated in Wise County, Texas, and being 76.5 acres out of the Henry Buckner Survey, and described by metes and bounds as follows: Beginning at the southwest corner of the Henry Buckner Survey; Thence north 523 varas; Thence west 838 varas; Thence south 525 varas; Thence east 838 varas, to the place of beginning, containing 76.5 acres, and being the land conveyed by Will Renshaw and wife to City National Bank of Decatur, by deed shown of record in Vol. 119, page 77, of the Deed Records of Wise County, Texas." W. T. Waggoner as president executed the deed.

From the undisputed evidence, we gather that this last named bank encountered financial difficulties and that W. T. Waggoner, who was then living and its president, advanced the necessary funds with which to honorably settle its affairs. The evidence establishes the fact that the bank held certain properties and assets whereby it was agreed that if and when any property was sold, the funds received from the sale would go to the credit of Mr. W. T. Waggoner.

Mr. Waggoner died in the year 1934, and it appearing from his will that his surviving wife, Mrs. Ella Waggoner, was the devisee entitled to such assets, belonging to said bank, or the proceeds thereof, the bank,

through its proper officers conveyed the 76.5 acres "being the land conveyed by Will Renshaw to the City National Bank, by deed recorded, etc." to Mrs. Waggoner. The description of the tract contains the identical error in the beginning point as the deed from Renshaw to the bank. This deed is dated November 13, 1941.

Mrs. Ella Waggoner brought suit on May 18, 1943, against J. L. Waggoner to recover title and possession of the tract in question, and described same correctly by metes and bounds.

The defendant J. L. Waggoner discovered that a mistake had been made in the, description of this tract of land and he procured from Will Renshaw, on July 7, 1943, a simple quit claim deed which correctly describes the tract. Mrs. Ella Waggoner desired to sell this land and found a prospective purchaser in the person of James. W. Smith, but before entering into any transaction with Smith, Mrs. Waggoner, through her duly authorized agent, learned that J. L. Waggoner was making some claim to this land after he made no effort to purchase same from Mrs. Waggoner, and was told that Smith would buy it. J. L. Waggoner wrote Smith a letter on September 5, 1942, in which he said: "This is to notify you that I have heard you are considering buying a 76½ acre tract of land from Mrs. W. T. Waggoner that is now a part of my pasture. I wish to advise you that I will contest any sale made and this should serve as sufficient notice to you that I will not give possession of said land."

With this "monkey wrench" thrown into the transaction, Mrs. Waggoner, in the year 1945, executed a deed conveying to J. L. Smith whatever interest she had in the tract of land, describing it correctly, and also assigning to him her cause of action against J. L. Waggoner, including the right to prosecute same in his own name and right, and Smith then intervened in the suit, and became the actual plaintiff.

Having also learned of the error made in the metes and bounds description of the tract, on November 13, 1944, Will Renshaw and wife executed a correction deed, containing a general warranty, to James W. Smith as grantee, correctly describing the land, and this deed in its recitations gives the history of Renshaw's transactions with the bank, his past due indebtedness to it, the fact of the suit for debt and foreclosure and the compromise and settlement made, and the fact of the erroneous description

employed in the deed executed by him and wife, and expressly reciting that it was the intention of the grantors to convey the tract that is correctly described in the deed.

Fact is this correction deed gives a complete history of the entire transaction beginning with Renshaw's debts and deed of trust given on the land, down through Mrs. Ella Waggoner and into James W. Smith.

J. L. Waggoner, in answer to Smith's intervention, defended on two theories: (1) That he held the land through adverse possession for ten years before Mrs. Waggoner brought suit, and (2) that his uncle, the late W. T. Waggoner had made him a gift of the land.

The instant suit between Smith and J. L. Waggoner was tried to a jury, and, at the conclusion of the taking of testimony and hearing evidence, the trial court instructed the jury to find for the defendant, and judgment was rendered in his favor.

Smith has appealed and we are of opinion that the trial court erred in giving the peremptory instruction for the defendant, and our reasons are: First, on the theory of adverse possession for ten years before Mrs. Waggoner brought suit, we find the defendant J. L. Waggoner testifying that he fenced the tract of land so as to include it in his "pasture, sometime in March, 1933," but his testimony discloses that the fence between his lands and this tract was left "down" for quite a distance, and that he built a fence on two sides and mended the fence on a third.

And we pause here to say that no valuable improvement of any kind, character or description was placed on the premises except this fence, and it is not at all certain, from the evidence, that the defendant provided the materials for the whole of the fence, or how much of the fence then on the lands was utilized by him. It is undisputed from his own testimony that he only used this tract in controversy as a part of his "pasture."

It is absolutely certain, from the undisputed record, that when Will Renshaw and wife attempted to deed the lands to the bank in full settlement of the suit brought against him for debt and foreclosure, in 1929, J. L. Waggoner had no use of and claimed no use or occupancy of the lands. In fact, J. L. Waggoner makes no pretense at claiming the land by adverse possession or as a gift until sometime in March of the year 1933. Inasmuch as J. L. Waggoner's testi-

mony attempts to cover both adverse possession and "a gift" from his uncle, W. T. Waggoner, the record discloses the following:

On May 11, 1942, a Mr. G. W. Turpin, agent and representative of Mrs. Ella Waggoner, wrote J. L. Waggoner, saying, in substance, that this small tract had been recently deeded by the bank to Mrs. Ella Waggoner; that the tract adjoins J. L. Waggoner or is in his pasture; that Mrs. Ella Waggoner wanted to sell it, and the letter concluded: "We thought you might be interested in buying it and would like to hear from you in that respect. We do not know what it is worth, have never seen it and should you be interested we would like for you to submit an offer."

In answer to this letter from Turpin, J. L. Waggoner, on May 15, 1942, wrote Turpin that he intended to be in Fort Worth sometime within a week "and will drop by your office and discuss this matter with you."

It will be noted that at that time J. L. Waggoner made no claim of title by adverse possession or by gift.

Turpin testified that J. L. Waggoner came to see him, that they discussed the matter of his purchasing the land, that Waggoner offered to give $5 an acre for it and no more and that, in the conversation, Waggoner said: "As a matter of fact Uncle Tommie gave me the land"; that Turpin said to him that he should go out and talk to Mrs. Ella Waggoner about it and tell her these things but that J. L. Waggoner said, "No, I won't talk to her about that. I never did claim it; and they would think I was trying to get something I am not entitled to."

In detailing the conversation that J. L. Waggoner had with his deceased uncle, this is what the defendant testified: That he saw Mr. W. T. Waggoner at Mr. Ed Halsell's house, and Mr. Waggoner wanted to sell this small tract to the witness; he asked the witness what it was worth and witness told him four or five dollars an acre, and that W. T. Waggoner said: "If it is not worth any more than that, I will just give it to you." And this witness then added to his testimony the following words: "I told him I thought the land would be held under limitation."

The witness could not fix the exact time that this detailed conversation was had, but said that it was sometime in March of 1933.

Under the undisputed record, J. L. Waggoner could not have claimed ten years limitations against any person in March of 1933. Not having reached any agreement to purchase the tract from Mrs. Ella Waggoner, her agent and representative, Turpin, wrote J. L. Waggoner on September 2, 1942, advising him that an agreement had been had with J. W. Smith to sell the tract to him and expressing the belief that Smith would make Waggoner a good neighbor and the letter closes: "At any rate, we trust the sale will meet with your approval as it brought Mrs. Waggoner more money than you ever would have paid, not needing the land, and she, of course, needed to dispose of it."

When J. L. Waggoner received this letter he wrote Smith the letter dated September 5, 1942, in which he advised Smith that he (Waggoner) "will contest any sale made" and that he would not give possession.

Mr. Turpin testified that in reply to one letter he had written J. L. Waggoner, concerning the purchase of the land, Waggoner replied that he would not give $10 per acre for it but would give $5.

After J. L. Waggoner wrote the prospective purchaser, Smith, that he would contest the sale, Mr. Turpin, on September 9, 1942, wrote J. L. Waggoner telling him that Mr. Smith had advised him of Waggoner's attitude toward the sale and, after expressing some regrets occasioned by the then situation, the letter states: "Mrs. Waggoner is under obligation to deliver this land. It has been sold fair and square and you were given the refusal of it also fair and square as the record will show. We do not know on what grounds you will base your claim but we do know to whom the land belongs and know that Mrs. Waggoner has a right to sell it to whomever she may choose. She will recognize the claim of no one to the land except herself individually." According to J. L. Waggoner's best estimate the fence he built in enclosing this tract with his pasture cost about $300.

E. P. Gibson, a former officer of the bank that held title to the land after it was conveyed to satisfy Renshaw's indebtedness, testified that he had an oral agreement with J. L. Waggoner that he could use the tract of land, if he would pay the taxes due on it.

The testimony of E. P. Gibson, former officer of the said bank, discloses that, in

the transaction had with W. T. Waggoner, when he turned over to the bank certain personal funds for use by the bank, "Mr. W. T. Waggoner advanced considerable money to help finance this deal (the reorganization of the bank) and the bank agreed to hold this property and other property, and turn over to him what was realized from it"; that "the bank just kept on with it (meaning the tract of land in controversy) but we agreed to deliver what was realized from it."

Further, in his testimony, this witness said: "Mr. W. T. Waggoner did not take this land over, but the bank did agree to deliver what was realized from it, and other assets."

This testimony comes from a wholly disinterested witness, and we pause to say that J. L. Waggoner produced no other evidence to establish what claim, if any, W. T. Waggoner had on the tract in controversy and what right he had with respect to it, or what control he had, if any, over it.

As we view the evidence, and it is undisputed, when W. T. Waggoner had the purported conversation with J. L. Waggoner, in which J. L. Waggoner claims W. T. Waggoner made him a gift of the land, the record title was in the last organized bank— it was not in W. T. Waggoner—and the testimony does not, as a matter of law, establish the fact that the tract of land was held in trust by the bank for W. T. Waggoner, but it does disclose that while the bank had the record title, nevertheless, because of Mr. W. T. Waggoner's advancement of monies to the bank for its reorganization, the bank agreed to give a lien upon the bank's assets to secure Mr. W. T. Waggoner in the repayment of the monies he had advanced.

■ So far as J. L. Waggoner's claim of a gift inter vivos is concerned, we hold that at the time W. T. Waggoner is supposed to have "given" the land to J. L. Waggoner he did not have such a title as that he could convey same by a mere oral gift. He was in no position to nor could he, at that time, divest the bank of its title, divest himself of what rights he may have had in relation to the land, orally, or give immediate and complete possession to J. L. Waggoner. Under the facts and circumstances surrounding this tract of land and the title thereto, during the lifetime of W. T. Waggoner, Mr. Waggoner was not able to make an oral gift of the land to J.

L. Waggoner that could be effective or enforced in the courts of the land unless W. T. Waggoner was then in a position to deliver immediate possession to his donee. Such possession could not have been given by W. T. Waggoner without some affirmative action on the part of the banking institution that then held the record title and was, from the evidence adduced, exercising control over the land and claiming the right of possession through its tenant.

21 Tex.Jur., paras. 16, 17 and 18, pp. 36 to 40; Peterman v. Harborth, Tex.Com. App., 300 S.W. 33.

This seems obvious to us. Let us illustrate: No one knew or ever heard of the supposed oral gift made in 1933 except the claimant, J. L. Waggoner. Suppose that between such time and the death of W. T. Waggoner, in 1934, oil had been discovered on the land adjoining this tract, and suppose that the bank had been offered $1,000 per acre for the land, and suppose that the sale price would have repaid Mr. W. T. Waggoner all that he had advanced to the bank, leaving a sum of money far over and above what the bank owed Mr. W. T. Waggoner, then no one would seriously contend that W. T. Waggoner was entitled to the entire proceeds of the sale. Or, suppose the "other assets" held by the bank had been sold and had brought more than sufficient funds to reimburse Mr. W. T. Waggoner, could it be successfully contended that W. T. Waggoner would be entitled to the possession of and title to the tract of land in controversy?

We see no necessity for the citation of any authority to support our views with respect to the right or power of W. T. Waggoner to give this tract of land to J. L. Waggoner "in March, 1933." It seems too plain to us, under the undisputed evidence, that no such gift could have been made.

■ In this connection let us here observe that if J. L. Waggoner makes a serious contention as to any gift to him by his late uncle, he is certainly in no position to criticize or urge any point on the fact of the erroneous description that "bobbed up" in the deed from Renshaw to the bank. If this deed was not intended to convey and did not convey the tract in controversy to the bank, then W. T. Waggoner never at any time, during his lifetime, had the slightest interest in it. Mr. J. L. Waggoner cannot "eat his cake and

have it too." The evidence shows that Renshaw had no other land in the Buckner Survey, that there was but one Buckner Survey in Wise County, and that it was Renshaw's intention to convey the said tract to settle his indebtedness to the bank. The evidence does not so much as raise an issue of fact, on this matter, as we see it. This brings us to J. L. Waggoner's claim of adverse possession.

He is compelled to stand or fall on the ten years statute, Vernon's Ann.Civ.St. Art. 5510.

We are almost persuaded that the judgment of the trial court should be reversed and rendered, but, giving the most liberal construction that we can make of the testimony and evidence, we are of opinion that it can do and does do no more than raise an issue of fact as to title by limitations, and it was error to direct a verdict for the defendant.

There is no merit in the contention of appellee that the plaintiff did not show an unbroken claim of title from the sovereignty; we are convinced that he did so. The erroneous description employed in Renshaw's deed to the bank furnishes no such break in the title as is contended for by appellee, under the record before us.

The judgment of the trial court is reversed and the cause is remanded.